## N. Y. SUPERIOR COURT.

MORRIS RAPHELSKY agt. JAMES LYNCH, sheriff.

A motion for a new trial on the ground of newly discovered evidence, may be made and granted *after judgment final* entered in the action.

Such a motion will be granted, where it appears from the papers used on the motion that the newly discovered evidence is material to the issue; that it goes to the merits of the action; that it is not cumulative; that it overthrows the plaintiff's claim upon which he recovered, and shows the suit to be a conspiracy, conceived in fraud and maintained by perjury. And that the evidence was not discovered until after the trial.

*General Term, December,* 1871.
*Before* BARBOUR, *Ch. J.,* McCUNN *and* JONES, *JJ.*

A. J. VANDERPOEL, *for defendant appellant.*

THE defendant, on or about the 7th day of February, 1864, seized fifty cases of leaf tobacco, under and by virtue of several writs of attachment duly issued out of the supreme court against the property of William Salamon.

At the time the said property was so seized, it was on storage with G. Merle's Son & Co., No. 291 Water street, and they had given their receipt, dated December 22, 1863, stating that said fifty cases was received on storage by them "from Mr. James Parker, and subject to the production of this receipt."

The receipt at the time of the trial bore these indorsements : "James Parker to J. Cooper," "John Cooper," "Philip Franklin;" and the plaintiff claims to have purchased the tobacco from Franklin and received the receipt from him.

James Parker, the first indorser, was sworn as a witness in plaintiff's behalf on the trial, and testified that he

" never owned the tobacco; it belonged to William Salamon. John Cooper was his clerk." "I was acting for Salamon" "Mr. Salamon told me to take the tobacco to Merle & Sons." "I don't know what the tobacco sold for; Cooper sold it."

John Cooper, the second indorser, did not testify on the trial.

Philip Franklin, the third indorser, testified that he purchased the tobacco from Cooper and sold it to the plaintiff, and transferred the warehouse receipt to him by indorsing and delivering it. A bill of the tobacco from Franklin to the plaintiff, dated January 4, 1864, was produced, and Franklin testified that the plaintiff paid for it at the time of the purchase.

On his cross-examination he testified that Cooper first came to him about the tobacco on Saturday, January 2, and he told Cooper he would find out on Monday, whether he could find a customer for it or not. That he saw the plaintiff the same day about it, and before he purchased it from Cooper, the plaintiff had agreed to take the tobacco. That he gave Cooper a $2,000 due bill to be redeemed the next day, and received from the plaintiff three checks on the Park Bank— one for $500, one for $800, and one for $2,000—and that he redeemed his due bill, held by Cooper, with the $2,000 check.

The plaintiff was sworn, and testified that he purchased the tobacco from Franklin, January 4, and paid for it in three checks dated that day, on the Park Bank, for $2,000, $800, and $500, and the balance in cash; that he had not that amount of cash in the bank at the time, and wanted some little time to make it up, and told Franklin he must not present the checks immediately. He further testifies that he received the warehouse receipt at the same time indorsed by Franklin; that he did not then know Salamon, Parker or Cooper, and did not know that Salamon, or anyone else, but Franklin was the owner of the tobacco or warehouse receipt. He also testifies that he had, perhaps $1,000 in money in the Park Bank; and $20,000 of 7.30s deposited there, but

that he could not draw against the 7.30s without making some arrangement with the cashier.

Theodore P. Cornwell, from the Park Bank, testified that on the 6th of January, 1863, the plaintiff had $936 50 to his credit in the bank, and about the same amount on the 4th; that there was no deposit of money or check until January 16th, when plaintiff made a deposit of $5,000; that his check for $500 was paid, January 19, to P. Franklin or order; the check for $800 was paid January 20, to P. Franklin or order; and the check for $2,000 was paid February 5, 1864, to P. Franklin or bearer. He also testified that the credit for $20,000 in 7.30s bonds entered in plaintiff's bank book under date of September 30, 1863, was in the handwriting of the collection and discount clerk of the bank.

The defendant, by his own witnesses, and by the cross-examination of the witnesses for the plaintiff, showed on the trial, that in 1863, the debtor, William Salamon, was a wholesale and retail dealer in tobacco and segars in Philadelphia; that he closed up his business there in a summary manner the latter part of December, 1863, and absconded; that he came to New York, and from New York went to St. Catharine's, Canada, before January 1, 1864, in order to escape from his creditors; that he was indebted in a large amount, and had purchased merchandise during the month of December, for which he had not paid.

That Parker and Mrs. Salamon went to St. Catharine's and joined William Salamon in January, 1864, and that Cooper was there also.

The manipulation of the goods before they were stored with Merle & Co. also showed a fraudulent intent to keep from creditors.

The plaintiff sought protection under the statue making warehouse receipts negotiable, and claimed to be an innocent *bona fide* purchaser of the property before the seizure by the defendant. The defendant had no evidence to produce on the trial to show that the alleged transfer to the plaintiff did

not occur on the 4th of January, as testified to by him and by Franklin.

A verdict was rendered in plaintiff's favor, and judgment was rendered thereon against the defendant on the 20th day of October, 1870.

In January, 1871, the defendant ascertained the testimony of Franklin and of the plaintiff, given on the trial, was false; that there was never any sale of the tobacco to the plaintiff, and that the alleged sale was concocted, and the bill of sale made out, and the warehouse receipt indorsed to the plaintiff after the defendant had attached the property, and that he could establish these facts by Annie Salamon, James Parker and John Cooper.

The defendant accordingly obtained from Annie Salamon her affidavit, setting forth that she was the wife of William Salamon, and came to New York from Philadelphia on the 26th of December, 1863; that soon after her arrival James Parker delivered to her the warehouse receipt mentioned; that, in addition to the fifty cases of leaf tobacco mentioned in that receipt, there was plug tobacco and segars in New York, belonging to her husband; that she was introduced to Franklin, and at his request she hired a store in his name in Brooklyn, and placed the plug tobacco and segars there for sale in his name on January 1, 1864; that she also delivered to him the said warehouse receipt for safekeeping, and afterwards at his request, procured James Parker to indorse it; that Franklin started for Canada, to see her husband, on the evening of January 6, she giving him $10 towards defraying his expenses; that after Franklin left for Canada, she called on Mrs. Franklin, and inquired about the receipt, and Mrs. Franklin took it from the drawer and showed it to her and told her it was all right; that before Franklin returned to New York, and on January 10, she and James Parker started for Canada, where they found her husband at St. Catharine's, and she returned to New York, about the middle of January, and was then informed by Franklin, that the tobacco had

been attached by the defendant, but that he (Franklin) still had the warehouse receipt; that one Wm. L. Flaherty, came from Canada to aid her in looking after the property, and that Flaherty and Franklin arranged to commence a suit against defendant for said property in the name of this plaintiff, and plaintiff agreed to pay Flaherty $1,200 out of the sum recovered.

Defendant also obtained the affidavit of James Parker, corroborating Annie Salamon, and stating that he indorsed the receipt January 6th, at the request of Franklin and Mrs. Salamon; that there was no other indorsement on it at the time, and that he saw it in Mrs. Franklin's possession after Franklin had left for Canada, on the occasion testified to by Annie Salamon.

Defendant also obtained the affidavit of John Cooper to the same effect, and setting forth that there was no sale, or pretended sale, of the leaf tobacco until after Mrs. Salamon and Franklin returned from Canada; and after it was attached; " then in order to have everything *bona fide*, Franklin had a bill of sale of the said tobacco from William Salamon to deponent made out, and induced deponent to sign a note for the amount, or about the amount of the bill; that said Franklin also, at the same time, made out a bill of sale of said tobacco from deponent to him (Franklin;)" that both of said bills of tobacco were dated back some ten or twelve days to bring the transaction prior to the issue of the attachments, and, after the said papers were completed, Parker indorsed the warehouse receipt at the request of Franklin; on that same day, Franklin told Parker that he would procure a person to claim the tobacco, as it was better his (Franklin's) name should not appear.

Upon these three affidavits, and defendant's own affidavit, setting forth, among other things, that all of said facts had been discovered by him since the trial, and that it was impossible for him to have ascertained the facts before said trial, and other papers set forth in the printed case, the defendant

gave notice of motion for a new trial, upon the ground of newly discovered evidence, which motion was adjourned from time to time to April 27, 1870.

Pending this motion, the attorneys for the defendant obtained an order to show cause why the judgment should not be opened, so far as to allow defendant to make the said motion for a new trial; and upon the return of said order, after hearing the parties, the court (SPENCER, J.,) gave defendant leave to make such motion for a new trial, and opened and set aside said judgment so far as to enable defendant to make it. The motion for a new trial came on to be heard before MONELL, J., on the 25th day of April, 1870, and was denied. From the order denying said motion the defendant appealed to the General Term. The reasons given by Mr. Justice MONELL, for his decision are set forth at fols. 222 to 238 of the case.

The order opening the judgment was overlooked by Mr. Justice MONELL, at the time he decided the motion, and upon his attention being afterwards called to that order, he stated that he had overlooked it, but the papers were in manuscript, and he said he did not want the trouble of going over them again, and would let the order denying the motion stand, *pro forma*, and the defendant could bring the matter up in the general term.

I. The practice adopted by the defendant in applying to have the judgment opened, and for leave to make the motion for a new trial, was authorized by and was in accordance with the decision of this court in the case of *Stilwell* agt. *Staples*, (4 *Robt*. 639).

A court possesses an inherent power over its own judgments, and can, where justice requires it, vacate a judgment in order to relieve a party from technical difficulty (WOODRUFF, J., *in Court of Appeals; Folger* agt. *Fitzhugh*, 41 *N. Y.*, 230).

II. Even if the judgment had not been opened by previous order, the court should have heard and decided the motion upon the merits (*Folger* agt. *Fitzhugh*, 41 *N. Y.*, 228;

*Tucker* agt. *White*, 27 *How.*, 97; *Tucker* agt. *White*, 28 *How.*, 78, where all the decisions on the subject to that date are cited and commented upon; *Blydenburgh* agt. *Johnson*, 9 *Abb.*, *N. S.*, 459). .

The decisions, that a motion for a new trial cannot be made after judgment, are based upon the technicalities of the old practice, and are not in harmony with the spirit of modern jurisprudence. There is no reason in such a rule, and that it would sometimes work great injustice the case at bar fully illustrates. It would practically prevent a granting of new trials on the ground of newly discovered evidence. In case of surprise upon the trial, a defendant is prepared, at the close of the case, to make his motion, but how can a defendant move for a new trial when he is ignorant of the facts which justify it or render it necessary? Newly discovered evidence to be available for such a motion, must have been discovered after the trial.

III. Upon the merits the defendant is clearly entitled to a new trial.

1. The newly discovered evidence is material to the issue —it goes to the merits of the case, and is not cumulative. It overthrows completely the plaintiff's claim that he was an innocent and *bona fide* purchaser, or any purchaser of the property in question, and shows this suit to be conspiracy, conceived in fraud and maintained by perjury.

2. The evidence was not discovered until after the trial. Defendant was not able to discover it before. He used great diligence in obtaining testimony for the trial, and is not guilty of laches (*Oakley* agt. *Sears*, 1 *Robt.*, 73 ; *Adams* agt. *Bush*, 2 *Abb.*, *N. S.*, 104, 110; *Quinn* agt. *Lloyd*, 1 *Sweeney*, 253; *Jackson* agt. *Laird*, 8 *Johns.*, 489).

IV. The court should exercise its power and grant a new trial, because justice requires it.

The newly discovered evidence, as set forth, shows this suit to be conspiracy, on the part of the plaintiff and his principle witnesses, to use this court to rob the defendant,

Raphelsky agt. Lynch.

and those whom he represents, of the property in question, by fraud and perjury.

When the court becomes aware that such a conspiracy exists, and is about to succeed, it should reach forth its strong arm, if necessary, to prevent consummation of the wrong.

V. The order appealed from should be reversed, and a new trial granted.

J. S. WOODWARD, *for plaintiff respondent.*

The trial of this action was commenced before *Mr. Justice.* FITHIAN and a jury, on the 15th June, 1869, and the verdict. was rendered on 16th June, 1869.

That final judgment upon the verdict was entered and perfected 20th October, 1869, plaintiff's proceedings having been stayed by various orders made on the application, *ex parte,* of the appellant from time to time, extending the time to make and serve a case and exceptions.

That on 21st October, 1869, notice of the entry of the judgment was duly served on the attorneys of the appellant.

That no appeal has been taken from the judgment.

That execution was issued upon the judgment 16th December, 1869, the issue of it at an earlier period having been delayed at the request of the attorneys for the appellant.

That the notice of motion for new trial was served on 14th January, 1870.

The court below, at special term, Mr. Justice MONELL, denied the motion, holding it was made too late, after judgment absolute had been entered.

From this order the (defendant) appellant appeals to the. general term.

I. Motions for a new trial upon a case and exceptions, or upon the ground of surprise, or newly discovered evidence, must be made before, and cannot be made after, judgment absolute has been entered (Supreme court: *Jackson* agt. *Fassit,* 21 *How.,*

279, CLERKE, J., 280; *S. C.*, 33 *Barb.*, 645; *Peck* agt. *Hiller*, 30 *Barb.*, 655; *Shelden* agt. *Stryker*, 42 *Barb.*, 284, 287-8; *S. C.*, 27 *How.*, 387; *Jackson* agt. *Chase*, 15 *Johns.*, 354; Superior court: *Anthony* agt. *Smith*, 4 *Bosw.*, 503; *Barnes* agt. *Roberts*, 5 *Bosw.*, 73, 78, 80; *Magnus* agt. *Tritchett*, 2 *Abb.*, *N. S.*, 175; *Gurney* agt. *Smithson*, 7 *Bosw.*, 400; *Anderson* agt. *Dickie*, 26 *How.*, 199; *S. C.*, 17 *Abb.*, 83; *Stilwell* agt. *Staples*, 4 *Robt.*, 639).

The court below was, therefore, right in denying the motion, and that order should be affirmed by this court.

II. The defendant (appellant) has been guilty of great and inexcusable negligence in obtaining his testimony claimed to be newly discovered (*Graham & Waterman on New Trials*, vol. 4, *pp.* 462, 472, 483-4; *and vol.* 3, *pp.* 1026 and '7; *The People* agt. *Myers*, 10 *How.*, 261; *Leavy* agt. *Roberts*, 8 *Abb.*, 310; *The People ex rel. Oelricks* agt. *Superior Court*, *&c.*, 10 *Wend.*, 285, 289, 291).

Such motions are granted with reluctance (3 *Graham & W.*, 1083-4-5).

The evidence must have been discovered since the trial (*Oakley* agt. *Sears*, 7 *Robt.*, 112; *Dodge* agt. *N. Y. & Washington S. S. Co.*, 37 *How.*, 524; *S. C.*, 6 *Abb.*, *N. S.*, 451; *Adams* agt. *Bush*, 2 *Abb.*, *N. S.*, 104; *Meyer* agt. *Fiegel*, 38 *How.*, 424; *Quinn* agt. *Lloyd*, 1 *Sweeny*, 253).

III. The newly discovered evidence is wholly immaterial and cumulative.

The newly discovered evidence must be material and not cumulative (*Barrett* ag. *Third Ave. R.R. Co.*, 1 *Sweeny*, 568).

IV. Newly discovered evidence which goes merely to impeach the credit of witnesses examined on the trial, is no ground for a new trial. It is not material within the rule (*Beach* agt. *Tooker*, 10 *How.*, 297; *Meakin* agt. *Anderson*, 11 *Barb.*, 216; *Powell* agt. *Jones*, 42 *Barb.*, 24).

V. A new trial will not be granted where such evidence merely goes to disprove what was sworn to on the former trial,

nor where it is to a fact controverted on the former trial, nor where it is merely cumulative (*Fleming* agt. *Hollenbeck*, 7 *Barb.*, 276; *The People* agt. *The Superior Court, &c.*, 10 *Wend.*, 285; 291-3; *Meakin* agt. *Anderson*, 11 *Barb.*, 215, 223-4; *Harrington* agt. *Bigelow*, 2 *Denio*, 109; *Brisbane* agt. *Adams*, 1 *Sandf.*, 195-8; *Halsey* agt. *Watson*, 1 *Cairns*, 24; *Pike* agt. *Evans*, 15 *Johns.*, 212, 213; *Graham & Waterman on New Trials, vol.* 1, *pp.* 495-6, 472, 478, *vol.* 3, *pp.* 1074, 6, 7, 8; *Tripler* agt. *Ehehalt*, 5 *Robt.*, 609-10; *Sproul* agt. *The Resolute Fire Ins. Co.* 1 *Lansing*, 71.)

VI. A new trial will not be granted in any case, on the ground that the verdict is against evidence, when the testimony is conflicting, or wher : there is evidence on both sides —unless the verdict so strongly preponderates against the evidence as to evince passion, prejudice, &c., on the part of the jury (*Murphy* agt. *Boker*, 3 *Robt.*, 1; *De Fonclear*, agt. *Shottenkirck*, 3 *Johns*, 170; *Eaton* agt. *Benton, et al., Ex.*, 2 *Hill*, 576, 578; *Keeler* agt. *Fireman's Ins. Co. of Albany*, 3 *Hill*, 251; *Fleming* agt. *Executors of Hollenback*, 7 *Barb.*, 271; *Hall* agt. *Morrison*, 3 *Bosw.*, 520; *Lewis* agt. *Blake*, 10 *Bosw.*, 198; *Arnoux* agt. *Homans*, 25 *How.*, 427; *Cothrun* agt. *Collins*, 29 *How.*, 155).

VII. There is no ground for the exceptions taken upon the trial, they are clearly frivolous (*Allen* agt. *Bodine*, 6 *Barb.*, 383; *Porter* agt. *Ruckman*, 38 *N. Y.*, 210; *Rundle* agt. *Allison*, 34 *N. Y.*, 180, 184; *Bronson, Receiver, &c.*, agt. *Tuthill*, 3 *Keyes*, 32; *Murray* agt. *Smith, Adm., &c.*, 1 *Duer*, 412; *Worrall* agt. *Parmelee*, 1 *Comst.*, 519; *Shorter* agt. *The People*, 2 *Comst.*, 193; *Ashley* agt. *Marshall*, 29 *N. Y.*, 494.)

VIII. The court has no power to extend the time to appeal from a judgment, either directly or by setting it aside, and directing the entry of a new judgment (*Caldwell* agt. *Mayor of Albany*, 9 *Paige*, 572; *Monroe* agt. *Widner*, 11 *Paige*, 529; *Wait* agt. *Van Allen*, 22 *N. Y.*, 319).

Raphelsky agt. Lynch.

And what it cannot do directly it has no power to do by indirection.

*By the court*, McCunn, J.—This is a motion for a new trial on the ground of newly discovered evidence. The controversy arose about a quantity of tobacco, which defendant, on the 7th of January, 1864, levied on as sheriff of the county. Plaintiff undertook to prove, that some few days before the levy by the sheriff, the property had been transferred to him through the assignment of warehouse receipts. The testimony, although very much shaken by a severe cross-examination, was believed at the time by the jury, and they found a verdict of nearly $5,000 for plaintiff. Affidavits are now presented to us, showing that newly discovered evidence exists, and that that evidence will show this suit to be a conspiracy on the part of the plaintiff, and others, and that their design was to use this court, to enable them to carry out their fraud against the sheriff. I need not say, that if such a conspiracy exists, or has existed on the part of the plaintiff, as is shadowed forth in the affidavits, it is the duty of this court to intercept it at once.

The following principles are settled in regard to granting new trials on the ground of newly discovered evidence. The testimony upon which the motion is based, must have been discovered since the former trial. It must be such as could not have been obtained with reasonable care before. It must be material to the issue. It must go to the merits of the case, and not to impeach the character of former witnesses. It must not be cumulative; the facts must be strong, and the party offering them free from laches. The affidavits presented with the case here, show that the facts contained therein, were discovered since the trial. They show a conspiracy to enable suit to be brought against the sheriff, and these facts were not discovered until a quarrel took place after the trial between the plaintiff and the party from whom he claimed title, and the witness on the trial. It could

not (the testimony) have been obtained until some of the conspirators disclosed the facts, because it was their secret, known to them alone, and could not be reached by physical industry. It is material, because it (the new evidence) shows that the plaintiff never owned a dollar's worth of the property sued for, and it does not impeach any of the witnesses, because none of them swore to this conspiracy before. It (the evidence now offered and set up in the affidavits) is not cumulative, for the reason that no proof of any kind was offered defendant going to show this conspiracy. The defendant is free from laches, because he applied to the court the instant the conspiracy was discovered. In fact, the testimony now sought to be introduced, is very material, and not cumulative. It relates to a point upon which no testimony was given on the trial. It relates to the vital point in the case. "Title in plaintiff."

It is true, that Raphelsky says he bought the property on the 4th, but he does not say, that the bill of sale and warehouse receipt were signed and indorsed on the 4th. It was the indorsement of the warehouse receipt and the signing of the bill of sale which gave him the title, and if these were not executed before the attachment by the sheriff, no matter whether dated back or not, his action fails. He says, he bought the goods on the 4th. He then had reference, no doubt, to the date of the bill of sale and the indorsement of the warehouse receipt which were both ante-dated, and not to the actual time of the transaction. They (the receipt and bill of sale) were dated on the 4th, but the affidavits now presented, clearly show that this was a false date, and that the bill of sale and indorsement on the warehouse receipt were gotten up after the Sheriff's levy, and that they were ante-dated, so as to bring the date before the sheriff's levy under the attachment. The question as to the time when the bill of sale and indorsement of the warehouse receipts were actually signed, never came up on the trial. It was supposed at the time of trial, they were executed on the 4th.

It never entered the minds of anyone, that this was a conspiracy, and (about the dates of these instruments) that the papers were dated back.   It now appears, by the wife of the person whose property the tobacco was, and from other reliable proof, that all the papers were a fraud.   We must reasonably conclude, that the jury had they had before them the facts contained in these affidavits, disclosing the newly discovered evidence, attached to the case in this cause, their verdict might have been affected by them, and they might have found for defendant.   These facts had not been disclosed at the time of the trial, but were discovered some time after; and as soon as they were discovered, application was made at once.   There is, therefore, no laches imputable in not giving them in evidence.

If the sheriff's affidavits be true, he is placed here under great difficulties.   When an officer of the law is under real disadvantage, and is at a loss how to act, the court must endeavor to help him, as far as possible, away from these difficulties; at the same time, it must see that no wrong is done the other party.   In regard to the law governing this case, first, as to the absolute rule of 1799, denying new trials after the entry of judgment and without a stay for that purpose, the court, in many instances, in construing the rules of 1799, laid them down so rigidly, that in many cases suitors found unreasonable difficulties in their way—difficulties and inconveniences worse than those which the rules were intended to correct.   Indeed, these stern rules (1799) were so far disused and disregarded, and so little put in force down to 1832, that in many cases, the rule was forgotten, and motions were often made and granted for new trials after judgment, without even a knowledge of the rule being in existence (*Roosevelt* agt *The Heirs of Fulton*, (7 *Cow.*, 107).

The sound maxim of policy is, that a greater evil should be avoided for a less, and a less good should give way to a greater.   The rules of 1799 were harsh and oppressive, and

the courts acting under them seldom or ever enforced them twice out of three times during a period of thirty-three years. They skillfully or intentionally avoided them, and after years of experience, finding the rule worked badly, in 1832, the legislature, at the solicitation of the courts, passed an act under which a new practice was inaugurated, and this statute allowed the granting of new trials after judgment, and even after execution was issued (*Chap.* 12, § 1, *laws of* 1832). It must be borne in mind, that no former act had fixed the rules and practice. The rules of 1799, these technical rules I speak of were simply adopted by the court, without the aid of the legislature, and these rules were always relaxed where good faith was shown by the parties. From 1832, until the adoption of the Code in 1848, and '9, an express statute (*Session laws* 1832, *chap.*, 12), and the rules of the court passed in conformity therewith, authorized motions for new trials on newly discovered evidence after judgment. Such motions were constantly made at special term held every three months, and if judgment had been entered and collected, it was set aside, and restitution ordered. Under the Code of 1848, and '49, a new system was being inaugurated. It was a mooted point whether new trials could be granted, the doubt being created by the provision of the Code of 1849, section 265, as to judgment becoming final after four days; but even then it was held that if a formal stay was merely granted within the four days, a motion might be made any time after judgment (2 *Sandf.*, 681). Under the Code, however, of 1851, and '52, the four day provision contained in section 265 of the Code of 1848, and '9, and the provision for a stay were dropped entirely, and as the Code now stands, there is nothing prohibiting such motion, so that the Code is in harmony with the act of 1832, and with the rules and practice established thereunder. I say, in harmony with the act of 1832, because section 389 of the Code of 1848, and section 469 of the present Code provide, that the then existing (present) rules and practice of the

court that were consistent with that act, "shall continue in force subject to the powers over the same of the respective courts as they now exist," and as this section of the Code is now in force : it must follow, that the practice of allowing motions for new trials after judgment and without a stay established by the act of 1832, is in full force and effect, and apply to our present practice, and the rules of 1799, do not apply. On the contrary, the rules of 1799, were wholly abrogated by virtue of the act of 1832 ; so that they do not now exist at all. Such was the practice laid down by Mr. Justice SLOSSON of this court, in the case of *Benedict* agt. *Caffe*, (3 *Duer*, 669). That learned judge says, "the entry of judgment does not prejudice the motion for a new trial on the ground of the verdict being against evidence, &c. The terms of this rule (rule 8 of the superior court) plainly imply, that such a motion may be made notwithstanding the entry of judgment. And we find nothing in the provisions of the Code inconsistent with it." This rule was also established in *Maloney* agt. *Dows*, (18 *How.*, 27), and in *Allego* agt. *Duncan*, (20 *How.*, 210). It has been stated in the learned opinion below (on this motion), that the decisions in this court since the Code, were uniform in not granting motions for a new trial after judgment. My learned brother must be in error in this regard, because I find, (as I have just cited), that Mr. Justice SLOSSON, (3 *Duer* 699), in a case immediately in point, holds that the entry of judgment does not prejudice a motion for new trial. The case in 2 *Sandf.*, 681, in fact, decides the question in the way I contend, but only in a more indirect form, because there a new trial was ordered, and that after judgment. The cases in 4 *Bosw.*, 503, and 5 *Bosw.*, 73, and 7 *Bosw.*, 400, and 26 *How.*, 199, cited in the learned opinion below against our views, were decisions made under the impression that the rules of 1799, in the absence of anything to the contrary in the Code, were in full force and effect. And the very learned judges in deciding those cases, unintentionally no doubt, leaped over

the decisions of sixteen years; decisions made under the acts of 1832 and the rules framed thereunder, which expressly gave the right to make these motions at any time, without stay and without motion for leave for that purpose, and which act still stands in full force and effect. Nay, more, as I have before stated, that act absolutely abrogated the rigid rules of 1799, so that it seems that the learned judges deciding the cases above mentioned, utterly ignored, or had forgotten, the laws of 1832. Again, my learned brother in deciding this motion below, fell into another error, in saying that only one case is to be found in the supreme court exhibiting a contrary doctrine to his views. With the very highest regard for that learned brother's research and attainments, I beg to be permitted to call attention to three cases in that court; the case of *Mersereau* agt. *Pearsall*, (6 *How.*, 294); *Tucker* agt. *White*, (27 *How.*, 96,) *Tucker* agt. *White*, (28 *How.*, 78). In all of them are to be found learned opinions (opinions by the court) indicating and establishing a contrary doctrine. I find also, in the common pleas, *Maloney* agt. *Dows*, (18 *How.*, 27), a very able opinion of Chief Justice DALY. That learned judge shows conclusively that the practice under the act of 1832 is now in full force and effect. "The Code," Judge DALY says, " has made no material change (from the laws of 1832) as to the course of procedure, where the object is to obtain a new trial." But the four cases cited from the supreme court, in the learned opinion below, do not, in my opinion, show that this question has been decided in that court adversely to our views, because in three cases out of the four, the motions were actually heard and decided, and new trials granted on the merits, notwithstanding the dicta of some of the judges on this question of practice, and the other (15 *Johns.*, 353), was decided under the old rule of 1799 and before the laws of 1832 were passed. And in the case of *Gurney* agt. *Smithson*, in supreme court, the reasoning of the learned judge in that court and his decision were based on false premises, having entirely overlooked the fact

that the practice under the act of 1832 prevailed for sixteen years immediately preceeding the enactment of the Code. We now come to the most important case yet cited (*Folger agt. Fitzhugh*, 41 *N. Y.*, 288), a decision which we now must follow implicitly. Notwithstanding our learned brother's (below) construction to the contrary. Mr. Justice GROVER, wrote the opinion, holding that a motion could be made for a new trial after judgment, and four others of those learned men (MASON, MURRAY, DANIELS and HUNT), concurred, and Mr. Justice WOODRUFF held, that the supreme court had inherent power and control over its own judgments, and certainly, this view of Mr. Justice WOODRUFF amounted to the same thing. It was, in fact, holding that the court could grant new trials after judgment. The other two learned judges, JAMES and LOTT, dissented. Mr. Justice JAMES, writing a short opinion dissenting from the practice of granting new trials after judgment. Mr. Justice LOTT saying nothing on this subject. So that we have six judges holding, in that case, that the courts below have the power to grant new trials after judgment, and that they have inherent control over their own judgments, and certainly, the court can only have inherent control for the purpose of seeing manifest justice done and correcting errors, and relieving suitors from oppression, wrong, mistakes, or misfortunes where justice requires it, by granting relief in the way of new trials or otherwise after judgment, and while I must, and shall at all times, pay the utmost deference to the views of my brethren, sitting below, yet I must repeat that the right to grant new trials after judgment, came up in the *Folger and Fitzhugh* case, was fully and ably discussed, and that six of the judges held, beyond peradventure, that the court had a right to grant new trials after judgment; and that only one of the judges (JAMES) dissented from that view, LOTT being silent on the question; and the dissent of Justice JAMES was placed, as I learn, on mere technical grounds of practice. The learning displayed and the law

laid down in this case (*Folger* agt. *Fitzhugh*), by the court of last resort, is the humane, sound and correct rule. It brushes away all technicalities, it settles the question, and places the rights of injured suitors beyond the reach of technical and uncertain minds. The decision in that case (*Folger* agt. *Fitzhugh*), has made this sound rule definite, certain and notorious, at the same time, it avoids delay and saves large expense and time to the parties. All the decisions, to the effect that a motion for a new trial cannot be made after judgment and without a stay, are based upon the technicalities of the old practice of 1799, and are not in harmony with the spirit of modern jurisprudence. There is no reason in such a rule, and its enforcement would sometimes work great injustice, as the case at bar fully illustrates. The enforcement of such a rule would practically prevent the granting of new trials on the ground of newly discovered evidence. How can a defendant move for new trial when he is ignorant of the facts which justify it, or render it necessary. Newly discovered evidence, to be available for such a motion, must, of necessity, have been discovered after trial, as in this case. Here the plaintiff based his rights to recover on a bill of sale, or the indorsement or transfer of a warehouse receipt from one Salamon, dated January 4th, 1864, and he, plaintiff, and his witnesses swore on the trial, that the said bill of sale and receipts were executed on the day they bore date, 4th January, 1864, and upon the sole strength of such swearing, the plaintiff recovered. It is now clearly shown by proof, to my mind reliable, that the witnesses perjured themselves, and that no sale took place until days after the sheriff had attached the tobacco—that the bill of sale and warehouse receipt were both ante-dated so as to make them read, and take effect before the attachment and levy. Now, in the name of justice, would it be right to deprive the sheriff, a public officer acting in the line of his duty of an opportunity to show the truth of the statements contained in his affidavits. The order at special term should be

reversed. We have not considered the order made by Mr. Justice SPENCER, opening the case and allowing the motion for a new trial to be made. That order was disregarded by the learned judge below on the hearing of this motion for a new trial. We think, this was correct, because we can only believe that the motion to open the judgment and allow this motion to be made, was done in accordance with absolute technicalities unnecessary now to be resorted to. And we believe that the discussion of the original motion, without the aid of Mr. Justice SPENCER's order for a new trial, both as to the facts and the law, was properly understood by the learned judge who decided the motion on its merits; but we hold that he committed error in denying the motion.

Chief Justice BARBOUR and Mr. Justice JONES concurred.